UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CINDY WESTALL,                          )
                                        )
            Plaintiff,                  )
                                        )
      vs.                               )        Case No. 4:16-CV-00066 (CEJ)
                                        )
NANCY A. BERRYHILL[1], Acting           )
Commissioner of Social Security,        )
                                        )
            Defendant.                  )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I. Procedural History

On March 29, 2012, plaintiff Cindy Westall protectively filed an application for
supplemental security income with an alleged onset date of August 1, 2010. (Tr.
168–75).[2] After plaintiff's applications were denied on initial consideration (Tr.72–
76), she requested a hearing from an Administrative Law Judge (ALJ). (Tr.87; 162–
65).[3]

Plaintiff and counsel appeared for a hearing on June 3, 2014.  (Tr. 164). The
ALJ issued a decision denying plaintiff's application on July 16, 2014. (Tr. 10–27).
The Appeals Council denied plaintiff's request for review on November 18, 2015.
(Tr. 1–5). Accordingly, the ALJ's decision stands as the Commissioner's final
decision.

## II. Evidence Before the ALJ

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting
Commissioner Carolyn W. Colvin as the defendant in this suit.
[2] Plaintiff filed this application for supplemental security income pursuant to 42 U.S.C. §§
1381-1385.
[3] Plaintiff originally requested a hearing for November 8, 2013. But on December 23, 2013,
her attorney withdrew the request for the hearing. (Tr. 67; Tr. 93-119).

## A. **Disability Application Documents**

In an undated Disability Report (Tr. 202–10), plaintiff listed her disabling conditions as depression, back pain, gout, emphysema, and numb feet. An updated report submitted on July 11, 2012 indicated worsening foot pain and breathing difficulties. (Tr. 254–58). Plaintiff reported that she stopped working on August 1, 2010, when she was laid off. However, she states that her health conditions as of August 1, 2010, were sufficiently severe to prevent her from working. Plaintiff's employment history included work as a cashier, a desk clerk at a hotel, a home health aide, and a laundry worker. (Tr. 204–05). To treat her various health conditions, doctors prescribed various medications for emphysema and gout, Ambien for sleeping,[4] Effexor for depression,[5] Xanax for anxiety and depression,[6] and Vicodin for pain.[7] (Tr. 206). In her updated disability report dated April 30, 2012, plaintiff noted additional prescriptions for Percocet,[8] Morphine, and Mobic.[9] (Tr. 252).

In a Function Report dated April 26, 2012, (Tr. 231–38), plaintiff stated that she lived in a house with her immediate family. In response to a question about her daily activities, plaintiff claimed that she generally started the day by waking her

---

[4] Ambien is used for the short-term treatment of insomnia. *See* Phys. Desk Ref. 2867-68 (60th ed. 2006).
[5] Effexor, or Venlafaxine, is indicated for the treatment of major depressive disorder. *See* Phys. Desk Ref. 3196 (63rd ed. 2009).
[6] Xanax is indicated for the treatment of panic disorder. *See* Phys. Desk Ref. 2655-56 (60th ed. 2006).
[7] Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. *See* Phys. Desk. Ref. 530-31 (60th ed. 2006).
[8] Percocet is a combination of Oxycodone and Acetaminophen. Oxycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. *See* Phys. Desk. Ref. 1114 (60th ed. 2006).
[9] Mobic or Meloxicam is a nonsteroidal anti-inflammatory used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. It can also be prescribed to treat ankylosing arthritis. http://www.nlm.nih.gov/medline plus/druginfo/meds/a601242.html (last visited on Nov. 4, 2014).

teenage children at about 6:00 AM. While the children get ready for school she takes her medications and lay down in bed with a heating pad watching television. She reported that back pain interfered with her ability to complete most chores. Her children took care of the pets, did the dishes and yard work, cleaned the home, and cared for themselves. Plaintiff stated that she starts the washing machine, but the children perform the rest of the laundry tasks. She did not prepare breakfast or lunch, because the children ate these meals at school. In the evenings and on weekends, she prepared frozen foods or sandwiches, as difficulty with bending and standing for long periods of time inhibited her ability to use the stovetop for cooking.

Plaintiff reported that her capacity to do everyday tasks became difficult because of back and foot pain, muscle spasms, and difficulty breathing. Additionally, plaintiff's depression led to sleep issues. She could, however, go out alone to retrieve mail, drive, and shop for groceries or personal items about once a month. Moreover, she could pay bills, count change, handle a savings account, and use a checkbook or money orders. Her hobbies included watching television and, on occasion, crotchet. She had no problems with her family but had difficulty getting along with neighbors and others. Plaintiff estimated that she spent about ninety percent of her time at home. But she did not need to be accompanied when she went out. Plaintiff stated that she experienced difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, concentration, and getting along with others. Furthermore, she could not walk farther than one block in hot or cold temperatures without resting. If she suffered back spasms or breathing difficulties, then she had to rest for several

hours before resuming walking. Plaintiff could pay attention for several hours at a time but there were times when she was unable to finish a task, conversation, a movie, or a book that she had started. She was able to follow instructions, such as a recipe, but she preferred to do things her way "and not the way someone else wants it done." (Tr. 236).

Plaintiff reported that she respects authority figures, such as police officers, but if she believes she or her children are "in the right" she will "go to the extreme" if necessary. (Tr. 237). Plaintiff also reported that she struggles with anger issues. She was fired from her job as a cashier in a tobacco store because she checked for identification too often and argued with customers. With regard to her ability to handle stress, she stated that she tended to hold in tension and isolate herself, which resulted in explosive behaviors and loss of temper. Finally, plaintiff added that she had struggled with grief since the death of her father in 2008.

A third-party Function Report completed by plaintiff's husband is consistent with plaintiff's own report, although he described her emotional condition as "bipolar." (Tr. 222–29). Additionally, in an April 2012 supplemental report, plaintiff indicated that she checks her email in the evenings for about thirty minutes. (Tr. 252).

In a Work History Report plaintiff described her prior work experience. (Tr. 240–47). From November 2009 to July 2010, plaintiff was an in-home healthcare worker. In that position she cooked, cleaned, and did the shopping for patients. (Tr. 240). Plaintiff alleged that foot swelling interfered with her ability to perform these tasks, which required periodic walking, standing, and sitting. Prior to her home healthcare work, plaintiff worked as a cashier in a convenience store. That job

required periodic walking, standing, and sitting for hours. (Tr. 242). Her prior positions as a front desk clerk at a hotel, a nursing or medical aid, and as a cashier at a liquor and department store involved many of the same duties and conditions. (Tr. 240–47). Her work at a nursing home and a residential facility, which took place "years ago," involved more physical labor because she had to operate Hoyer lifts and help to move patients. (Tr. 244).

### B. <u>Testimony at Hearing</u>

Plaintiff testified that she quit school after the ninth grade but later completed Certified Nursing Aide training. (Tr. 38). She further recounted that she last worked in 2010 as a home health aide, and prior to that she worked for a few months as a cashier, a hotel desk clerk, and a laundry worker. When asked about her medication regimen, plaintiff responded that each day she took fifteen milligrams of morphine, "Percocet 10 325's" three times, Remeron[10] in the morning and at night, 15 milligrams of levothryoxine, an Albuterol inhaler and nebulizer, a nebulizer she could not recall, Mobic, Claritin, and a Spiriva inhaler. (Tr. 38–39). She stated that the medications sometimes made her drowsy.

Plaintiff testified that she was unable to walk farther than a half a block without running out of breath. (Tr. 39). She also had back spasms after sitting for longer than fifteen or twenty minutes. Plaintiff believed she could lift a gallon of milk from the floor to the counter, but it could be difficult for her to lift two gallons due to back strain.

Plaintiff stated that she lives with her daughter in a two-story home. (Tr. 40). Her daughter did most of the chores around the home, including washing the

---

[10] Remeron, or Mirtazapine, is prescribed for the treatment of depression. http://en.wikipedia.org/wiki/Mirtazapine.

dishes.  Plaintiff told the ALJ that a friend takes her to the grocery store about once a month.

Plaintiff's testimony about her typical day mirrors the statements she made in the April 26, 2012 Function Report. (Tr. 41).  Plaintiff testified that she was able to dress and bathe herself and to help her daughter prepare dinner.  According to her testimony, plaintiff often spent most of the day in bed watching television.  At night, she took a sleeping aid (Ambien) but she only slept for four or five hours. Plaintiff's doctors last adjusted her prescriptions for depression and anxiety several months prior to the hearing. (Tr. 42).

The ALJ asked vocational expert John McGowan, to address plaintiff's vocational history and identify the exertional levels of her past work. (Tr. 43–48). McGowan testified that given plaintiff's age, education, and work experience, in addition to her physical limitations, she would not be able to perform her prior work. (Tr. 45). He did, however, identify jobs in the national economy that could be performed by an individual with plaintiff's limitations. (Tr. 46). Specifically, he mentioned sedentary, unskilled, direct entry positions or otherwise stated, routine assembly jobs. He noted that Missouri had 794 positions for a final assembler of optical goods and 216 positions for hand packaging and sealing of pharmaceutical supplies. (Tr. 46). The ALJ then presented the hypothetical of a person with the same physical limitations but also with a need to take routine breaks, resulting in a fifteen percent loss in daytime work hours. (Tr. 46). The expert concluded that given the corresponding reduction in production, such a person would not be employable. (Tr. 46–47). Plaintiff's counsel then inquired whether numbness in the bilateral extremities might affect one's ability to work in the aforementioned

positions. McGowan said such numbness would preclude working in those positions. Also in response to counsel's questioning, McGowan testified that there would not be significant social interaction in those positions. (Tr. 47–48).

### C. **Educational and Medical Records**

Education records show that plaintiff consistently struggled with her grades in her elementary school years. (Tr. 266–70). When plaintiff was in the sixth grade, her Criterion Reference Tests demonstrated "significant weaknesses" in reading and math; she scored in the 18th percentile. (Tr. 281). According to a social and behavior assessment, plaintiff did not interact well with her peers and she had become loud and threatening on a number of occasions. (Tr. 281). That assessment also remarked that plaintiff exhibited disrespect toward authority figures. (Tr. 281). When plaintiff was in middle school, the Division of Family Services placed her in Park Central Hospital. (Tr. 274, 281).

An Individualized Education Program plan from plaintiff's seventh grade year (May 1986) illustrated that she antagonized her peers and disrupted the classroom. Often, plaintiff did not complete her work. (Tr. 276). She received failing scores in all categories on a locally-administered standardized exam. (Tr. 271). By the 1986–87 school year, she was spending about 86 percent of her time in special education programs. (Tr. 284). In December 1986 the school suspended plaintiff for ten days due to a serious temper outburst. (Tr. 284). And in January 1987, the school district placed plaintiff in a behavior disorders program. (Tr. 275).

Plaintiff's medical records from the onset of her disability, in August 2010, to June 2014 are extensive. Although the Court has considered the entire record, the analysis of records that do not concern plaintiff's mental conditions is condensed.

On August 7, 2010, plaintiff underwent a psychological evaluation by Thomas J. Spencer, Psy. D. (Tr. 326–30). The evaluation was conducted for the purpose of determining Medicaid eligibility. (Tr. 326). During that consultation, plaintiff primarily complained of "emphysema," inability to afford her medications, and "all kinds of problems." (Tr. 326). Plaintiff told Dr. Spencer that doctors previously diagnosed her with bipolar disorder and posttraumatic stress disorder, and that she took Xanax for anxiety. (Tr. 326). She described her mood as "alright" but asserted that her temper flared up periodically. (Tr. 326). Plaintiff also reported that she had recently begun having trouble sleeping, "but this is not typically an issue." (Tr. 326–27). Plaintiff stated that she became anxious and depressed or "overwhelmed" when she thought of her father or grandmother. (Tr. 326, 327).

Plaintiff's daily activities included taking her children swimming, as they were out of school at the time. She also looked for jobs and kept up with housework. Occasionally, she crocheted, sewed, or used the computer. (Tr. 328).

When Dr. Spencer tested plaintiff's immediate memory, she recalled three out of three objects. (Tr. 329). She recalled zero out of three objects on a "recent" memory test. (Tr. 329). Dr. Spencer also assessed plaintiff's concentration. Plaintiff experienced some difficulty counting in series of three, accurately spelled "world" backwards, accurately recited five out of five numbers forward, and two out of three numbers backward. (Tr. 329). Plaintiff also correctly answered eight different arithmetic questions. (Tr. 330). Additionally, she accurately recognized two of three proverbs, three out of three sets of similar items, and three out of three social norms. (Tr. 329–30). Dr. Spencer noted that there was no obvious impairment in plaintiff's hygiene or grooming, that her eye contact was good, she showed no

physical distress, and that she was "fairly cooperative." (Tr. 328). Her flow of thought was intact and relevant, she did not demonstrate any hallucinations or delusions, but her insight and judgment were noted as "questionable." (Tr. 329).

From a review of plaintiff's psychiatric, medical, family, and social history, as well as her daily functioning and mental status, Dr. Spencer concluded that plaintiff had a mood disorder, posttraumatic stress disorder (by history), bipolar disorder (by history), and a GAF of 60 to 65. (Tr. 330). He further found that plaintiff had a "mental illness, albeit one that does not appear to interfere with her current ability to engage in employment suitable for her age, training, experience, and/or education." (Tr.330).

On October 12, 2010, plaintiff underwent an additional psychiatric evaluation conducted by Marc Maddox, PhD. (Tr. 381–91). His evaluation addressed two categories, 12.04 Affective Disorders and 12.06 Anxiety-Related Disorders. (Tr. 381). Generally, Dr. Maddox concluded that plaintiff's impairments were not severe. (Tr. 381). Under the 12.04 Affective Disorder category, Dr. Maddox found that plaintiff had a mood disorder and bipolar disorder (by history). (Tr. 384). He also noted that under the 12.06 Anxiety-Related Disorders category plaintiff struggled with posttraumatic stress disorder (by history). (Tr. 385). Dr. Maddox assessed the degree of limitation caused by these disorders within four branches: (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence, or pace, (4) and repeated episodes of decompensation. (Tr. 389). In each of the first three categories, Dr. Maddox concluded that plaintiff's degree of limitation was "mild." He further noted that she had no repeated episodes of decompensation. (Tr. 389). In his notes, Dr.

Maddox wrote that at the time of application the plaintiff "did not display any obvious psych-related difficulties during the teleclaim." He also noted that on August 3, 2010, an MER found plaintiff to have "normal speech, mood, and affect." Dr. Maddox also described an August 4, 2010, psychological evaluation, which stated that plaintiff had "residual symptoms related to grief [and] depression surrounding her father's death," and that plaintiff's "speech was normal, mood was fine, affect neutral, and FOT normal." (Tr. 391). The prior evaluation also yielded a diagnosis of mood disorder and a GAF of 60-65, as the evaluator "did not feel that [plaintiff's] impairments" would "interfere with her current ability to engage in employment." (Tr. 391). Dr. Maddox found that plaintiff could pay attention for several hours, drive, shop, go out alone, cook simple meals, and complete simple household chores. Plaintiff told Dr. Maddox that she struggled with concentrating and getting along with others. (Tr. 391). After reviewing the prior evaluation notes and conducting his own independent evaluation, Dr. Maddox found that plaintiff's allegations were only "partially credible," as her activities of daily living were inconsistent with medical evaluations. He concluded that plaintiff's "[c]ondition is not severe." (Tr. 391).

On January 31, 2012, plaintiff visited several doctors complaining of a migraine headache. She reported to Vijay S. Sekhon, MD, with the "worst headache ever." (Tr. 396). He conducted a brain CT scan and found no abnormalities. (Tr. 396). That same day, plaintiff also went to Rolla Family Clinic. Shaundelle Olusanya, FNP, examined her for a migraine plaintiff experienced on and off for four days. (Tr. 539). Olusanya's notes stated that "she was seen 4 days ago at RFC for a migraine headache and was given [N]ubain and Phenergan. She was reminded of

the office policy that she cannot get 2 shots of [N]ubain within the same week. She was offered a shot of [T]oradol but opted to go to the ER instead." (Tr. 539).[11] Also on that day, plaintiff appeared at Phelps County Medical Center complaining of a headache. (Tr. 483). The plaintiff underwent a lumbar puncture in addition to other diagnostic tests. (Tr. 483). Notes report that plaintiff "did not mention narcotic usage or recent visit with [primary care physician] who prescribed [T]oradol. In addition patient embellishes her story to say she only gets 160 10/325 [V]icodin when she really gets 168. Not truthful. Also demanding pain meds." (Tr. 485). The clinical impression was that plaintiff had chronic headaches and drug seeking behavior. (Tr. 486).

Plaintiff visited doctors at Phelps County Regional Medical Center with a sore tongue and a headache on February 9, 2012. (Tr. 476). Her general appearance was noted as "no apparent distress," and "alert." (Tr. 479). Several weeks later, Frank Elders, M.D., examined plaintiff at Phelps County Regional Medical Center on February 29, 2012. (Tr. 473–75). Plaintiff told Dr. Elders that she came into the hospital because of sleep issues. (Tr. 473). Dr. Elders discharged plaintiff with clinical impression of depression. (Tr. 475).

Pathways Outpatient employee Gene Schaefer, CSS, conducted an initial intake assessment of plaintiff on February 29, 2012. (Tr. 438–43). The presenting

---

[11] Nubain, or Nalbupine, is an injectable analgesic. http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682668.html (last visited on Mar. 9, 2011). Phenergan, or Promethazine, is used to relieve the symptoms of allergic reactions such as allergic rhinitis (runny nose and watery eyes caused by allergy to pollen, mold or dust), allergic conjunctivitis (red, watery eyes caused by allergies), allergic skin reactions, and allergic reactions to blood or plasma products. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (last visited on Mar. 11, 2011). "Toradol is "a trademark for preparation of ketorolac tromethamine," which is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" *See* Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

issues at that time included such statements as "I'm about to lose it," and "I've been kicking in doors"; plaintiff also presented "[a]nger control issues" because her "17 year old on has been using drugs and [plaintiff] has been confronting the people that she believes is supplying those drugs." (Tr. 438). Plaintiff's history of domestic assault issues, an alleged assault of her mother-in-law, and threatening of a neighbor were also summarized in the report. (Tr. 438–39). Current symptoms were listed as "racing thoughts," that affect sleep, poor concentration, anger, blunted affect, depression, somewhat rapid speech, and weight gain. (Tr. 439). Schaefer's assessment included comments from a previous evaluation:

> "[c]lient stated that she was court ordered to attend counseling due to a trespassing charge that her mother-in-law brought up against her. . . Client stated that she went into foster care at age 11 for about one month. Client stated that she received counseling during this time. Client stated that when she was in 6th grade she kicked the principal in the groin area and she was sent to a group home in Forshtye, Missouri, she was there for two years. She denied a history of impatient hospitalization."

> (Tr. 442).

Moreover, Schaefer provided a provisional diagnosis:

> "Client is a 38 year old female who has been involved in Pathways services several times. Her most recent episode of care ended in 2008. She presents today as an urgent client who is having issues with anger control, which has also been a problem in the past. She has "kicked in the door" of a home where she suspected her son[stet] was buying marijuana and also accosted staff at the Pleasure zone for selling 'bath salts' to her son. She has previously been treated for both PTSD and MDDR. Each time she has been in treatment with us, she has eventually gone off of her meds and suffered a relapse. She continues to report symptoms that are indicative of MDDR and she also has numerous symptoms of anxiety. She is no longer reporting any flashbacks or dreams of her father's death,

> but readily admits that she has not dealt with that after nearly 4 years."

(Tr. 442).

The provisional diagnosis on Axis I was major depressive disorder (moderate) and posttraumatic stress disorder. Schaeffer evaluated her Axis V with a Global Assessment of Functioning (GAF)[12] of 50. (Tr. 443).

Plaintiff then visited Forest City Family Practice on March 1, 2012, complaining of stress and sleep problems. (Tr. 424–25). She was prescribed Trazodone, and it was noted that plaintiff would seek additional help from Pathways. (Tr. 424).

Pathways progress notes from March 5, 2012, by Kelsey Hansen, BA, CSS, show that plaintiff expressed frustration with her son and discussed how her medical problems had impacted her. She was asked whether she felt that speaking to a counselor would help her deal with the problems with her son and her father's death. (Tr. 450).

Plaintiff returned to Forest City Family Practice on March 9, 2012, to acquire new sleeping medication. She reported that she had lower back pain and difficulties

---

[12] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairments in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 32-33 (4th ed. 2000) (DSM-IV). A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000). A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*. A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*

sleeping even though she took 100 mg of Trazodone.[13] (Tr. 422). The treating physician diagnosed plaintiff with insomnia and opined that it was likely depression related; she also recommended a follow-up psychology appointment. (Tr. 423).[14]

Pathways notes from March 12, 2012, indicate that plaintiff's "hygiene was good, however, [plaintiff] was still wearing pajamas. [Plaintiff's] mood was tired and affect matched." (Tr. 451). Treatment continued on March 16, 2012, when Kelsey Hansen, CSS, accompanied plaintiff to her psychiatric appointment. (Tr. 452). At that time, Hansen observed that plaintiff had good hygiene, appropriate clothing, and that her "mood was good and affect matched." (Tr. 452). Hansen reported similar observations on March 22, 2012. (Tr. 454).

On April 2, 2012, Pathways employee Amanda Brumley, BA, CSS, evaluated plaintiff's condition. (Tr. 455–58). She wrote that the presenting problems and situation included, lack of "motivation and energy," "excessive worry about her son," "a history of not cooperating with employers," "trouble with co-workers because she 'didn't socialize,'" "numerous contacts with the police," inability "to express her anger appropriately," "struggles with change," and "impulsive decisions." (Tr. 455). Her medications at the time were the muscle relaxer Flexeril, Vicodin for pain, Dulera inhaler for emphysema, Albuterol for emphysema, Ultram for inflammation, Trazodone for sleep, Xanax for anxiety, Neurontin, and Effexor for depression. (Tr. 456). Additionally, diagnoses in the notes included major

---

[13] Trazodone is a serotonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[14] And on March 14, 2012, plaintiff reported to Oluyomi Olusanya, MD, who diagnosed insomnia and prescribed Ambien. (Tr. 394–95). The physical exam notes comment that appearance shows "no apparent distress," and psychology indications were "oriented X3, depressed, CN's normal." (Tr. 394).

depressive disorder (recurrent and moderate), as well as posttraumatic stress disorder on Axis I. Brumley indicated an Axis V GAF of 50. (Tr. 457). Hansen completed a progress note on April 12, 2012, describing plaintiff as having good hygiene, acceptable clothing, and a good mood and affect. They discussed plaintiff's prior anger management classes. (Tr. 459). A progress report from April 6 and April 17, 2012, presented similar results. (Tr. 460).

Plaintiff continued treatment with counselors and doctors at Pathways during the spring of 2012. Denise Troy Curry, M.D., met with plaintiff regarding medication management on April 25, 2012. (Tr. 656–58). Plaintiff reported that Paxil caused headaches and that she had discontinued antidepressants. (Tr. 656).[15] Dr. Curry observed that plaintiff was "readily cooperative with [the] interview," "appropriately dressed and groomed," and had a "brighter demeanor." (Tr. 657). She further noted that plaintiff exhibited "good verbal fluency and comprehension coupled with full abstraction capacity" indicating "average intellectual function." (Tr. 657). Dr. Curry had an impression of major depression recurrent (severe, without psychotic features) and complicated bereavement syndrome, tolerance to sedating effects of medications, caffeinism, and inadequate sleep hygiene on Axis III, and a GAF of 59 on Axis V. (Tr. 657). Ultimately, Dr. Curry recommended an increase in Vistaril and follow-up appointments.[16] (Tr. 658).

On April 30 and May 14, 2012, plaintiff met with Hansen to discuss plaintiff's "recent anger outbursts," and sleeping problems. (Tr. 654–55). On April 27 and

---

[15] Paxil is a psychotropic drug indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. See Phys. Desk. Ref. 1501-03 (60th ed. 2006).
[16] Vistaril is indicated for the symptomatic relief of anxiety associated with psychoneurosis. See Phys. Desk Ref. 2217 (52d ed. 1998).

April 30, 2012, plaintiff visited Forest City Family Practice for an evaluation of her chronic back pain, COPD, and anxiety and depression[17] in connection with her disability benefits application. (Tr. 811–14).

Dr. Curry met with plaintiff regarding medication management on May 16, 2012. (Tr. 650–52). Plaintiff reported increased anxiety and "low mood." (Tr. 650). Dr. Curry advised plaintiff to continue using Vistaril, begin taking Citalopram on a trial basis, and discontinue Ambien.[18] (Tr. 651). Dr. Curry documented an impression of major depression recurrent (severe without psychotic features) and complicated bereavement on Axis I and a GAF of 59 on Axis V. (Tr. 651). A June 27, 2012, counseling session focused on anxiety and anger management strategies. (Tr. 649).

Dr. Curry met with plaintiff again on July 18, 2012. (Tr. 646–48). In her individual progress notes, Dr. Curry wrote that plaintiff came in for a follow-up, "reporting irritability" and "passive thoughts of death." (Tr. 646). Observations included that plaintiff was "readily cooperative with interview," "appropriately dressed and groomed," "speech clear," an "'overwhelmed'" mood, and generally normal assessments otherwise. (Tr. 647). On Axis I Dr. Curry found that plaintiff suffered from major depressive disorder (recurrent, severe without psychotic features), as well as complicated bereavement. Further, Dr. Curry found a GAF of

---

[17] Doctors noted that it was best that any psychological evaluation be conducted by a psychiatrist. (Tr. 814).

[18] Citalopram is used to treat depression. It is in the class of selective serotonin reuptake inhibitors. http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a699001.html (last visited on May 25, 2010).

42. (Tr. 647). Dr. Curry recommended plaintiff take Invega before bedtime and Cymbalta in increasing increments.[19] (Tr. 647).

Plaintiff visited Forest City Family Practice in the summer of 2012 for assorted medical issues including neck and back pain as well as a noted need for a psychological follow-up on July 9, 2012. (Tr. 807–10). Specifically, medical records indicate that plaintiff has a great deal of stress and "'can't take it anymore'"; plaintiff was noted to have used marijuana to cope. (Tr. 808).

On September 4, 2012, a transition and discharge plan was issued by Pathways as plaintiff "was not compliant in meeting with her CSS" or her psychiatrist. (Tr. 643–44). However, plaintiff resumed treatment on November 30, 2012. The pre-admission screening from that day by Gene D. Schaefer, CSS, provided provisional findings after plaintiff "report[ed] that she [had] been crying a lot" and "isolating herself." Plaintiff also told Schaefer that she suffered from anxiety and depression, and that she had recently been arrested. (Tr. 632–42). Schaefer made an Axis I determination of major depressive disorder (recurrent and severe without psychotic features), generalized anxiety disorder, and a GAF of 36. (Tr. 632).[20]

---

[19] Invega, or Paliperidone, is an atypical antipsychotic used to treat the symptoms of schizophrenia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a607005.html (last visited on Apr. 10, 2013). Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[20] Plaintiff did not have any additional psychological evaluations in September, October, or November of 2012, but on September 10, 2012, she visited the Forest City Family Practice for flu symptoms, on November 1, 2012, she returned to Forest City Family Practice for a severe cough, and on November 28, 2012, plaintiff went to the Phelps County Regional Medical Center for a motor vehicle injury. (Tr. 711–17; 795-802). Plaintiff also visited Forest City Family Practice for neck pain and numbness in her left arm on December 7, 2012. (Tr. 790–94).

Iouri Simonenko, M.D., met with plaintiff on December 19, 2012. (Tr. 629-630). During the course of the psychological evaluation, he reported that Pathways previously dismissed plaintiff from the program as she was uncooperative. He further noted that "she is angry with everything"; plaintiff allegedly told Dr. Simonenko that she would "end up hurting somebody," while denying any homicidal or suicidal intent. (Tr. 629). Dr. Simonenko recorded that plaintiff was "appropriately dressed" with "good eye contact," and showed a neutral to depressed affect, as well as good attention and concentration. Plaintiff stated that her mood was "okay." (Tr. 630). His clinical impression was an Axis I of major depressive disorder (recurrent, without psychosis), complicated bereavement, possible opioid dependence (iatrogenic), and a GAF of 45. (Tr. 630).

On December 31, 2012, a counselor, William Sitham, CSS, visited plaintiff's home to work on anger management strategies. (Tr. 627). Plaintiff stated that she had suffered a panic attack after the hospitalization of her husband. (Tr. 627).

In 2013, plaintiff continued treatment with Pathways. (Tr. 549–626). A home visit from Pathways provider William Witham, BS, CSS, on January 7, 2013, focused on anxiety management. (Tr. 626). Plaintiff reported that she cleaned her house because clutter increased her anxiety.  She also told Witham that she she was "too tired to meet for a very long time" because she had gone shopping the day before and had just gotten home from returning a rental vehicle. (Tr. 626). Plaintiff also visited Phelps County Regional Medical Center on January 13, 2013, reporting sleeping problems, dizziness, chills, cough, and trouble breathing. (Tr. 702). During Watham's home visit on January 25, 2013, plaintiff discussed her upcoming court date and managing anxiety. (Tr. 625).

On February 14, 2013, plaintiff discussed her issues with panic attacks and anxiety, and Watham discussed regular therapy attendance, as well as the benefits of deep breathing. (Tr. 624).[21]

In her counseling session with Watham on March 7, 2013, plaintiff and her counselor discussed anxiety issues, frustration and anger with people outside her family, and visualization techniques to reduce anxiety. (Tr. 623). On March 22 and March 27, 2013, plaintiff and Watham talked about anger and anxiety management, as plaintiff "has times when [she] 'feel[s] a lot going on.'" (Tr. 621–22).[22]

Plaintiff again had counseling with Watham on April 2, 2013, to address issues with anxiety and self-isolation, as she would "spend all day in [her] room sometimes." (Tr. 620). On April 15, 2013, plaintiff met with Amanda Brumley, CSS, LCSW, for an evaluation and assessment update. (Tr. 614–19). The presenting problems were "concerns about isolat[ion]," anxieties over her son and father, "limited contact with others," anger management, and conflicts with law enforcement. (Tr. 614). Her psychiatric symptoms were depression, anxiety, anger, legal issues, crying spells, feelings of hopelessness, helplessness, or worthlessness, insomnia, weight gain, fatigue, issues with self-esteem or self-confidence, excessive worry, and agitation or irritability. (Tr. 616–17). Brumley noted plaintiff's strengths, such as "very good communication skills" and "willing to talk to others and learn how to cope with her depression." (Tr. 618). Conclusions from that session included

---

[21] Plaintiff also received a diagnosis for bronchitis in February 2013. (Tr. 694–99).

[22] During the spring of 2013, and more specifically on March 1 and March 14, 2013, plaintiff also visited the Forest City Family Practice for medical issues including bronchitis and exacerbation of COPD, as well as associated shortness of breath and wheezing, congestion, trouble sleeping, and a puncture wound on her hand for which she requested Percocet. (Tr. 779–89).

an Axis I evaluation of major depressive disorder (recurrent and moderate), posttraumatic stress disorder, and an Axis V GAF of 38. (Tr. 618).

Counseling on April 30 and May 6, 2013, with Watham pertained to anger management, specifically controlling anger towards plaintiff's neighbors and coping with grief. (Tr. 612–13). Plaintiff noted that she planted flowers as a method of coping. (Tr. 612). The next day, on May 7, 2013, Maudanne Pursley, LPC, MA, met with plaintiff for crisis counseling. (Tr. 610). Plaintiff's son had called 911 when she plaintiff's said she "wanted to be with her father" on the fifth anniversary of his death. (Tr. 610). During the meeting, plaintiff told Pursley that she "would not commit suicide," though she was "tearful through most of the session." (Tr. 610). Records from this session assert that plaintiff "showed signs of depression, anxiety and anger." (Tr. 610).

On May 9, 2013, Sreekant Kodela, M.D., met with plaintiff. (Tr. 605–07). He advised that plaintiff come for a follow-up appointment in three weeks, participate in "relaxation techniques, anxiety management" and "anger management," and prescribed she take trial Clonidine 0.1 mg. (Tr. 607).[23] Dr. Kodela diagnosed major depressive disorder and pathological grief, and found a GAF of 45. (Tr. 607).

Dr. Kodela evaluated plaintiff again on June 11, 2013. (Tr. 597–99). Dr. Kodela opined that plaintiff appeared normal though her mood seemed "angry," "anxious," and "sad." (Tr. 598). He concluded for her assessment that Axis I included major depressive disorder and pathological grief. (Tr. 599). Moreover, on Axis IV he noted social stress and grief, and on Axis V, a GAF of 45. (Tr. 599). He

---

[23] Clonidine is indicated for treatment of hypertension. *See* Phys. Desk Ref. 843 (61st ed. 2007). It is also used in the treatment of alcohol and narcotic withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html (last visited Mar. 9, 2011).

prescribed continued therapy, a trial of Remeron 7.5 mg, and participation in relaxation techniques, anxiety management, and anger management. (Tr. 599).

Pursley, the counselor, also met with plaintiff on June 11, 2013. She noted that plaintiff was "somewhat anxious and depressed," and that her affect "was congruent" with her mood. (Tr. 602). This was the plaintiff's first regular session with a counselor and the topics discussed included, (1) "escalation of irritability and anger," (2) "feelings of depression," (3) "grief concerning her father's death," and (4) "consequences of acting on impulse." (Tr. 602).

Terry Austin, BS, CSS, met with plaintiff on June 28, July 9, and July 17, 2013. In those sessions Austin observed plaintiff's good mood; the two discussed conflict with neighbors, wellness goals, and anxiety reduction. (Tr. 593–95). During a home visit on July 24, 2013, Austin noted that plaintiff appeared "to be in a stable but depressed mood." (Tr. 591).

On August 11, 2013, Pamela Herbert, M.D., saw plaintiff at the emergency room. (Tr. 680–83). Plaintiff's chief complaint upon admission was "increased depression." (Tr. 681). Plaintiff allegedly said she "just needs something to go to sleep," and then left against medical advice. (Tr. 681–82).

On August 21, 2013, Terri Prugh, BS, CSS, went to plaintiff's home after plaintiff had "called the office in distress and crying." (Tr. 587). Counseling focused on coping skills for anxiety. (Tr. 587). Dr. Kodela also assessed plaintiff on August 21, 2013. (Tr. 584–86). His notes indicate that plaintiff "reported feelings of hopelessness, grief over her dad's death," and "feelings of lack of support." (Tr. 584). Moreover, plaintiff indicated that Remeron reduced her anxiety and anger. (Tr. 584). Dr. Kodela wrote that plaintiff appeared and spoke normally but that her

mood seemed anxious and sad. (Tr. 585). His assessment included an Axis I evaluation of major depressive disorder and pathological grief, and an Axis V GAF of 45. (Tr. 586). He recommended that plaintiff "participate in relaxation techniques, anxiety management" and "anger management." (Tr. 586). Plaintiff met with counselor Prugh on August 26, 2013 for a wellness check and on August 28, 2013 to "educate [plaintiff] on anxiety, impulsiveness, and anger management." (Tr. 582-83).

On September 3, 2016 plaintiff met with Prugh to discuss medication compliance. (Tr. 579). That same day, Dr. Kodela met with plaintiff. (Tr. 576–78). Dr. Kodela observed that plaintiff presented "appropriately dressed, well groomed" and with "good eye contact, no agitation, [and] no aggression." (Tr. 577). He stated that her mood appeared "better," and her affect within a reasonable range and less anxious, but still depressed. (Tr. 577). His assessment included an Axis I evaluation of major depressive disorder and pathological grief and a GAF of 48. (Tr. 578). His plan prescribed continued therapy, increase of Remeron to 15 mg, three times daily, and discontinuing Clonidine. (Tr. 578).

In an individual progress note dated September 5, 2013, counselor Pursley wrote that plaintiff "presented on time for the session" and "was appropriately dressed and groomed." (Tr. 574). She also noted that plaintiff's "[m]ood in the session was sad," and "[a]ffect was congruent with mood as evidenced by tears and client's self-report." Plaintiff's sleep was noted as disturbed, but her appetite normal. (Tr. 574). On September 6, 2013, Prugh met with plaintiff to "educate on grief management and anxiety coping methods." (Tr. 572).

Plaintiff reported to the emergency room on September 8, 2013, complaining of depression and a "stressful situation at home." (Tr. 674). Clinician Allison Modglin, PA-C, reported "no apparent distress," but found plaintiff suffered from depression. (Tr. 676, 678). Plaintiff was discharged with orders for a follow-up and continuation of home medication. (Tr. 678).

On September 12, 2013, Pursley observed several behavioral symptoms, including that plaintiff's "[m]ood in the session was agitated and angry," her "[a]ffect was congruent with mood as evidenced by raised voice and cursing," and her sleep pattern and appetite were "poor." (Tr. 568). Moreover, Pursley noted that "concentration and memory are intact," and that "thought process was goal directed." (Tr. 568). On September 13, 2013, Plaintiff went to Rolla Family Clinic with symptoms of nausea as her prescription medications were seized after a domestic dispute led to an arrest. (Tr. 525). That same day, Prugh made a wellness check at plaintiff's home and noted that plaintiff "has been in a crisis state for the last three days" and was "beginning to go through withdrawal from not having her medications." (Tr. 564). She further wrote that "rapport was easily established" and that plaintiff "was calm today at this point." (Tr. 564). The next day, on September 14, 2013, plaintiff visited Phelps County Regional Medical Center. (Tr. 668–73). She reported withdrawal after her pain medications were stolen. (Tr. 669). Laurence Hutchinson, M.D., diagnosed abdominal pain and anxiety, among other conditions. (Tr. 672).

Prugh counseled plaintiff on September 16 and 20, 2013, to discuss relationship issues and substance abuse treatment. (Tr. 560, 562). Pursley observed behavioral symptoms on September 24, 2013, including that "mood in the

session was depressed and tearful," and that the "affect was congruent with mood." Further, Pursley described "concentration and memory" as intact, and added that "no evidence of psychosis or substance abuse was observed or reported." (Tr. 558).

Unplanned multi-service progress records from September 24, 2013, by Dr. Kodela note that that plaintiff appeared normal and appropriately dressed but with mild agitation. (Tr. 556). Dr. Kodela characterized plaintiff's mood as sad and her affect as within a "reasonable range,"; her affect also seemed "depressed, anxious," and "congruous." (Tr. 556). He concluded that "patient is not considered to be in need of admission." (Tr. 557). His assessment included a finding of major depressive disorder and pathological grief on Axis I. He found on Axis V plaintiff's GAF to be 48. (Tr. 557). Dr. Kodela planned to continue therapy and Remeron 7.5 mg, twice a day. (Tr. 557).

A meeting summary by Prugh from September 26, 2013 centered on "anxiety management," after plaintiff called Pathways, "crying due to anxiety levels from recent break up with her husband." (Tr. 551–52). On September 27, 2013, plaintiff met with Pathways server Sarah Amidei, CSS. Amidei's narrative states that the plaintiff "seemed down throughout the appointment, crying at times," and "had a difficult time expressing what happiness is for her." (Tr. 549).[24]

Plaintiff attended counseling appointments with Pathways staff on October 4, 2013, October 11, 2013, October 15, 2013, and October 17, 2013. Those discussions centered on plaintiff's quarterly evaluation, family relationships, controlling anger, skills to handle stressful life occurrences, medication compliance,

---

[24] Plaintiff visited Phelps County Regional Medical Center on September 28, 2013, due to back pain; she reported that her pain medications had been stolen. (Tr. 663–67).

and in particular plaintiff mentioned that "she is very good at playing the system and can put on any act." (Tr. 822–26).

Dr. Spencer's medical source statement from October 17, 2013, evaluated the plaintiff in four areas: (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adapt. (Tr. 843–44). For understanding and memory, Dr. Spencer noted that she was not significantly limited in her ability to remember locations and work-like procedures or in her ability to understand and remember very short and simple instructions. (Tr. 843). Plaintiff was moderately limited in the ability to understand and remember detailed instructions. For the second category (sustained concentration and persistence), Dr. Spencer found no significant limitations for the ability to carry out very short and simple instructions or the ability to make simple work related decisions. He reported moderate limitations in the ability to carry out detailed instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by the; and the ability to complete a normal workday and workweek without interruption from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Finally, he ascertained that plaintiff was markedly limited in the ability to maintain attention and concentration for extended periods. (Tr. 843). In the third evaluation category (social interaction), Dr. Spencer found no significant limitations in plaintiff's ability to ask simple questions or request assistance. He found that she would be moderately limited in the ability to interact appropriately with the general

public, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to maintain socially-appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 844). The final category of Dr. Spencer's evaluation concerned plaintiff's ability to adapt. He concluded that she would have no significant limitations in the ability to be aware of normal hazards and take appropriate precautions and the ability to travel in unfamiliar places or use public transportation. (Tr. 844). Dr. Spencer found plaintiff to be moderately limited in the ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independently of others. (Tr. 844).

On October 22, 2013, plaintiff reported to Pathways for counseling, as well as a psychological evaluation by Dr. Kodela. (Tr. 816–21). Her counseling centered on anger management strategies. (Tr. 816, 821). Dr. Kodela's progress notes show that plaintiff reported "depression, anxiety, panic attacks, PTSD symptoms such as nightmares, hypervigilance" and "avoidance," as well as "constant anger" and "irritability." (Tr. 818). She "denied any suicidal or homicidal ideation," "any psychotic or manic symptoms," or substance abuse. (Tr. 818). Dr. Kodela noted that plaintiff's medications included Remeron and Percocet. (Tr. 818–19). He described plaintiff as a woman of normal weight, with good grooming and eye contact, with a normal volume and rate of speech, a sad mood, an affect within a reasonable range, but "still depressed" and anxious. (Tr. 819). He further characterized plaintiff as normal with regard to her thought process and content, perceptions, orientation, attention, insight, and judgment. Ultimately, he assessed

that on Axis I she had pathological grief and major depressive disorder and on Axis V she had a GAF of 48. (Tr. 820). Dr. Kodela recommended plaintiff continue therapy and Remeron, as well as relaxation techniques and anxiety and anger management. (Tr. 820).

On October 25, 2013, Dr. Kodela completed a medical source statement regarding plaintiff's mental health. (Tr. 828). In the first evaluative category of understanding and memory, he concluded that plaintiff was not significantly limited in the ability to remember locations and work-like procedures. He also determined that she was not significantly limited in the ability to understand and remember very short and simple instructions. Dr. Kodela found that plaintiff had moderate limitations in the ability to understand and remember detailed instructions. (Tr. 828). The second area of evaluation pertained to sustained concentration and persistence. Plaintiff was not significantly limited in the ability to carry out very short and simple instructions or the ability to make simple work related decisions. Dr. Kodela ascertained that plaintiff had moderate limitations in (1) the ability to carry out detailed instructions, (2) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) the ability to sustain an ordinary routine without special supervision, and (4) the ability to work in coordination with or proximity to others without being distracted by them. (Tr. 828). Finally, Dr. Kodela found plaintiff to be markedly limited in the ability to maintain attention and concentration for extended periods. (Tr. 828).

From October 29, 2013, to November 19, 2013, plaintiff attended counseling on eight separate occasions with Pathways staff. (Tr. 918–33). During those

sessions it was noted that plaintiff expressed varying degrees of depressed moods and medication compliance. Plaintiff's relationship issues with her family, financial problems, housing, self-control, her disability hearing, breathing techniques to manage anxiety, anger management, disturbed sleep, and conflict with a neighbor were also discussed.

On November 19, 2013, plaintiff met with Dr. Kodela to discuss ongoing anxiety. (Tr. 915–17). He recommended that she continue therapy and increase the dosage of Remeron to 15mg in the morning and 30mg at bedtime. (Tr. 917). Dr. Kodela met with plaintiff a week later, on November 26, 2013, when she told him about "significant increase in family friction," and "significant mood situations," with "periods of crying interspersed with periods of feeling okay." (Tr. 910–12). She also told Dr. Kodela that she required a new prescription for Xanax as hers was stolen. (Tr. 910). Dr. Kodela's progress note recorded that plaintiff's mood appeared "sad," and her affect "depressed, anxious." (Tr. 911). He wrote that her appearance was normal but "slightly irritable," and other indicators seemed normal. (Tr. 911). Dr. Kodela's assessment was major depressive disorder and pathological grief on Axis I and a GAF of 45 on Axis V. (Tr. 912). Plaintiff attended counseling that same day. (Tr. 913).

During counseling on December 3 and December 10, 2013, plaintiff was observed to be in an agitated mood, and anger management was discussed. (Tr. 908–09).

On December 17, 2013, Dr. Kodela saw plaintiff for a routine psychiatric appointment. (Tr. 905–07). In his report, Dr. Kodela noted that "[p]atient reported that she did have some struggle during the holidays but managed to cope with it

without use of any Xanax or morphine." He also reported that plaintiff "is sleeping reasonably," has "anger," and "some self referential ideation." Some ongoing depression, anxiety, and PTSD symptoms were reported. (Tr. 905). The two discussed prescription alternatives including Clonidine and second-generation antipsychotics. (Tr. 905). Dr. Kodela observed that plaintiff appeared less anxious but "still depressed," and had a "so so" mood. (Tr. 906). Otherwise, he found her appearance, speech, thought process and content, perceptions, orientation, attention, insight, and judgment to be normal. (Tr. 906). Dr. Kodela's overall assessment included an Axis I of major depressive disorder and pathological grief, and an Axis V of 45. (Tr. 907).

Dr. Spencer conducted a psychological evaluation of plaintiff on December 18, 2013. (Tr. 837–42). To reach his clinical conclusions, Dr. Spencer relied upon a Department of Social Services Disability and Adult Programs Services bill, a psychological evaluation he'd conducted on August 4, 2010, records from Phelps County Regional Medical Center, records from Pathways Community Behavioral Health, and a clinical interview. (Tr. 837). Dr. Spencer reported that plaintiff's chief complaints included PTSD, major depression, and "'anger issues.'" (Tr. 837). He reviewed her history of her present illness and also noted that she had suffered from PTSD since her father's death in 2006. Additionally, plaintiff told Dr. Spencer that she isolates herself in her home to avoid the anxiety she experiences in public places; she also discussed her sleeping problems, consistent depression, crying spells, panic attack, fatigue, lack of motivation, trouble concentrating, forgetfulness, and weight gain. (Tr. 837–38). Dr. Spencer's report summarizes plaintiff's psychiatric history, which included a ten-year, periodic course of

treatment at Pathways, abandonment by her mother, weekly visits from a support worker, and sexual assault during her teenage years. He also evaluated her social history, which included estrangement from her mother, a recent marital separation, domestic violence, educational issues including confrontations with teachers and failure to obtain a GED, "more time unemployed than employed over the years," a "long history of interpersonal problems in the workforce," past marijuana use, and multiple arrests for domestic violence, driving without a license, assault, and peace disturbance. (Tr. 838–39). Plaintiff also had a history of criminal offenses— including burglary, robbery, and assault—committed when she was a juvenile. (Tr. 839). Plaintiff's daily activities consisted of waking up her daughter for school, napping, watching television, and caring for her dogs. From a mental status exam, Dr. Spencer noted that plaintiff "was cooperative and seemed to be a decent historian." He observed that she "presented with a restricted affect," but that "no delusional beliefs were elicited" and "[f]low of thought was intact." (Tr. 839). He further opined that she "appeared to be of low average to average intelligence." Dr. Spencer's diagnostic formulation included an Axis I of major depressive disorder (recurrent, moderate to severe), as well as posttraumatic stress disorder. On Axis II he noted a personality disorder. His found a GAF of 50 to 55. (Tr. 840). Dr. Spencer added in his narrative that plaintiff "retains the ability to understand and remember simple instructions," "retains the ability to engage in and persist with simple tasks," and "demonstrated moderate to marked impairment in her ability to interact socially and in her ability to adapt to change in the workplace." (Tr. 840).

Three Pathways progress reports dated from December 19, 2013, to January 14, 2014, reflect discussions about anxiety and a possible manic episode, family

issues, self-control skills, use of Xanax, and plaintiff's upcoming disability hearing. (Tr. 899–904). On January 14, 2014, plaintiff attended a psychiatry and medication management appointment with Dr. Kodela. (Tr. 896–98). Plaintiff "reported that she is doing a little bit better, stated that she still [is] having some mood wings but not as much as before" and noted that she "is enjoying things better with her daughter" and "is able to set boundaries in terms of her family's behavior towards her." (Tr. 896). But, Dr. Kodela noted issues with regard to "mood swings, irritability, anxiety," and "panic attacks on occasions." (Tr. 896). Dr. Kodela observed that plaintiff's mood was "better," and her affect was less depressed and less anxious; and her appearance, speech, thought process and content, perceptions, orientation, insight, and judgment all seemed normal. (Tr. 897). He concluded that plaintiff should continue therapy and medications and that she had an Axis I of major depressive disorder and pathological grief, as well as a GAF of 48. (Tr. 898).

From January 21, 2014, to February 12, 2014, plaintiff attended six sessions with Pathways providers who documented that counseling related to anger management, communication skills, family issues, anxiety management, and disturbances in sleep (Tr. 888–95). On February 18, 2014, Dr. Kodela saw plaintiff who reported that she was "doing better," and "anxiety and anger still [were] present but manageable," though she still suffered from "initiation insomnia." (Tr. 885). Dr. Kodela observed that plaintiff's appearance, speech, mood, thought process and content, perceptions, orientation, attention, insight, and judgment appeared normal. (Tr. 886). He recorded that her affect had an "improved range," but should she was minimally depressed and "mildly anxious." (Tr. 886). Dr. Kodela

concluded that on Axis I plaintiff had major depressive disorder and pathological grief, as well as a GAF of 53 on Axis V. (Tr. 887). From February 20, 2014, to March 18, 2014, plaintiff participated in four counseling sessions with Pathways providers to discuss her future goals, coping skills and isolation, anxiety management, and communication. (Tr. 881–84).

On March 18, 2014, plaintiff had a psychiatric appointment with Dr. Kodela. (Tr. 877–80). He wrote that plaintiff "reported some ongoing stress" and "some anger," denied any suicidal or homicidal intent, had "no active concerns," was "coping well with stress" and was "able to go out and enjoy things with her daughter." (Tr. 877). She had some symptoms of anxiety and depression but otherwise appeared normal, with improved affect, okay mood, and normal perceptions, orientations, attention, insight, and judgment. (Tr. 877–79). He opined that plaintiff had major depressive disorder and pathological grief, and a GAF of 53 on Axis V. (Tr. 879).

 Counseling sessions from March 26, 2014, until April 18, 2014, covered plaintiff's marital separation, monetary issues, and physical health problems. (Tr. 869–76). On April 29, 2014, Dr. Kodela met with plaintiff who exhibited symptoms of depression and anxiety, but otherwise appeared normal. (Tr. 864–66). His assessment was major depressive disorder and pathological grief and a GAF of 53. (Tr. 866). Dr. Kodela recommended that plaintiff follow up in two to three months, continue medications, and participate in relaxation techniques, as well as anxiety and anger management strategies. (Tr. 866).

Plaintiff also received a medical source statement from Dr. Rachelle Gorrell with regard to her physical capabilities. (Tr. 830–31). According to Dr. Gorell,

plaintiff's use of psychiatric medications would inhibit her concentration, persistence, or pace. (Tr. 831).[25]

### III.  The ALJ's Decision

On July 16, 2014, the ALJ issued a decision containing the following findings with respect to plaintiff's application for disability benefits pursuant to Social Security Act § 1614(a)(3)(A):

1. Plaintiff has not engaged in substantial gainful activity since March 21, 2012, when she applied for benefits. 20 C.F.R. § 416.971 *et seq*.

2. Plaintiff has severe impairments, including chronic obstructive pulmonary disorder (COPD), disorder of the back, depression, anxiety, obesity, and gout. 20 C.F.R. § 416.920(c).

3. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the medical severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 416.920(d), 416.925, 416.926.

4. The entire record demonstrates that plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a), but cannot climb ladders, rope or scaffolds. Further, she can only occasionally climb ramps or stairs, stoop, crouch, kneel, crawl, or reach bilaterally overhead. Plaintiff must also avoid all use of hazardous machinery and unprotected heights. Finally, plaintiff must avoid concentrated exposure to irritants such as fumes, odors, dusts, and gases, and concentrated exposure to poorly ventilated areas. Plaintiff is limited to "simple" work as defined in the Dictionary of Occupational Titles as Specific Vocational Preparation levels one and two, which includes routine and repetitive tasks, with no strict production quotas, and the emphasis being on a per shift rather than a per hour basis.

5. Plaintiff is unable to perform any past relevant work. 20 C.F.R. § 416.965.

---

[25] Between October 31, 2013, and February 6, 2014, plaintiff also visited Forest City Family Practice for hypothyroidism, chronic pain syndrome, hair loss, degenerative joint disease of the lumbar spine, somatic dysfunction of the cervical and thoracic spine, and COPD (Tr. 846–62). Plaintiff also made several visits to her podiatry office between January and May 2014, complaining of pain in her right heel and lateral side of toe, as well as joint and muscle pain and swelling. (Tr. 943–49).

6.  Plaintiff was born on December 3, 1973, and was 38 years old, which is defined as a younger individual age 18-44, on the date she filed her application. 20 C.F.R. § 416.963.

7.  Plaintiff has a limited education and can communicate in English. 20 C.F.R. § 416.964.

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not the claimant has transferable job skills. *See* SSR 82-41; 20 C.F.R. Pt. 404, Subpt. P, App. 2.

9.  Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. 20 C.F.R. § 416.969.

10. Plaintiff has not been under a disability, as defined in the Social Security Act, since March 21, 2012, when she filed her application. 20 C.F.R. § 416.920(g).

(Tr. 15–27).

## IV. Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "'Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (*quoting Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and

others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (*quoting Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059–60 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, by comparing the RFC with the physical and mental demands of a claimant's past work. 20 C.F.R. § 404.1520(f). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past

relevant work. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); s*ee also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (*quoting Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). "'However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant.'" *Martise*, 641 F.3d at 932 (*quoting Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2020)). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946).

The ALJ's mental RFC analysis consisted of "a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listing in 12.00 of the Listing of Impairments (SSR 96-8p)." (Tr. 17–18).[26] His reasoning therefore "reflect[ed] the degree of limitation" he "found in the 'paragraph B' mental function analysis." (Tr. 18).[27] The paragraph B criteria used to determine an RFC includes the abilities to (1) understand, remember, or apply information, (2) interact with others, (3) concentrate, persist, or maintain pace, (4) adapt or manage oneself (the abilities to regulate emotions, control behavior, and maintain well-being in a work setting). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. In accordance with these factors the ALJ determined first whether there was an underlying mental impairment, and second, whether "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning." (Tr. 18).

After completing his mental function analysis, the ALJ concluded that plaintiff had mild difficulties in social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation for an extended duration. (Tr. 16–17). And, therefore, overall the ALJ found plaintiff's mental impairments to have moderate limiting effects. Accordingly, as part of his RFC he found that her work must be simple as defined in the Dictionary of Occupational Titles as SVP

---

[26] Evidence used to evaluate a mental disorder includes (1) evidence from medical sources, (2) evidence from the claimant and people who know the claimant, (3) evidence from school, vocational training, work, and work-related programs, (4) longitudinal evidence, (5) evidence of functioning in unfamiliar situations or supportive situations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.
[27] Marked limitations require that "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id*. And, "[r]epeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (Tr. 16).

levels one and two – routine and repetitive tasks, with no strict production quotas, and the emphasis on a per shift rather than a per hour basis. (Tr. 18).

### Dr. Spencer's Opinion

Plaintiff first argues that the ALJ failed to weigh Dr. Spencer's December 2013 opinion and that consequently, the RFC "was not supported by substantial evidence, as crediting Dr. Spencer's opinion would have changed the outcome of the case." [Doc. #16 at 11]. Plaintiff also takes issue with the ALJ's alleged failure to "state what weight he was affording Dr. Spencer's opinion that Westall would have moderate to marked limitation in social functioning and moderate to marked limitation in her ability to adapt to usual workplace changes." [Doc. #16 at 12].[28]

In his opinion, the ALJ explained the December 2013 evaluation as follows:

> In December 2013, the [plaintiff] was seen for a consultative psychological examination and was again diagnosed with major depressive disorder, as well as PTSD and personality disorder, not otherwise specified. GAF was 50-55, again suggesting a moderate degree of limitation (Exhibit 25F). Thus, while the claimant has had outpatient mental health treatment throughout most of the relevant period, she has not required inpatient hospitalization. Furthermore, mental status findings generally suggest only a moderate degree of symptoms and limitations.

> (Tr. 21).

Based on the above excerpt and in light of the totality of the ALJ's opinion, the Court finds that the ALJ considered Dr. Spencer's opinion, despite plaintiff's contention that the ALJ failed to weigh Dr. Spencer's 2013 assessment. *See* [Doc. #16 at 11]. The upshot of Dr. Spencer's opinion was reflected in the ALJ's finding

---

[28] An ALJ has discretion in how he weighs a medical opinion. If an opinion is not given controlling weight, than the weight afforded will vary depending on (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors which tend to support or contradict the opinion. 20 CF.R. § 416.927(c).

of moderate impairment; Dr. Spencer determined that plaintiff (1) "retains the ability to understand and remember simple instructions, (2) "retains the ability to engage in and persist with simple tasks," (3) "demonstrated moderate to marked impairment in her ability to interact socially and in her ability to adapt to change in the workplace," (4) "did not appear to need assistance in managing her benefits, (5) had major depressive disorder (moderate to severe), PTSD, and a personality disorder, and (6) had a GAF of 50 to 55. (Tr. 840). Moreover, the ALJ employed Dr. Spencer's GAF assessment, and considered the opinion in conjunction with all the other evidence in the record, such as mental status findings and the absence of inpatient hospitalization. (Tr. 21). Accordingly, the ALJ did in fact "'minimally articulate his reasons for crediting or rejecting evidence of disability.'" [Doc. #16 at 12 (citing *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997))].

Plaintiff also argues that the ALJ did not indicate the weight he placed on Dr. Spencer's 2013 opinion.[29] Plaintiff is correct on this point – the ALJ did not specify the particular weight he placed on Dr. Spencer's opinion. Nor did he explain with particularity the determinations that plaintiff had moderate to marked impairment of the abilities to interact socially and adapt to change in the workplace. (Tr. 840). However, this case is distinguishable from *McCadney v. Astrue*, where the Eighth Circuit reversed on the grounds that it was "unsure of what, if any, weight the ALJ afforded" to a psychologist's opinion. *McCadney*, 519 F.3d 764, 767 (8th Cir. 2008). There, the ALJ neglected to mention an entire diagnosis of a condition – dementia – in its opinion or questioning. *Id.* The Court classified this as a "most glaring omission," as it was impossible to determine whether and why such a critical

---

[29] The ALJ gave Dr. Spencer's 2010 assessment "limited weight." (Tr. 24).

diagnosis was discounted. *Id.* In this case, the omission is not glaring and does not present significant questions about the weight placed on the opinion. The opinion shows that the ALJ credited Dr. Spencer's assessment and considered the doctor's conclusions in conjunction with the totality of the record. And moreover, this case is distinguishable from plaintiff's citation to *Griswold v. Colvin*, where "the ALJ failed to discuss how much weight she gave to the opinion of [an] evaluating psychologist," where the opinion "if fully credited" would be outcome determinative. *Griswold*, No. 4:13-0148-DGK-SSA, 2014 WL 632084, at *1 (W.D. Mo. Feb. 18, 2014). In *Griswold*, the ALJ did not even *mention* the psychologist's opinion. *Id.* at *2; *see also Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (where "the decision [did] not say that the statements were considered at all."); *Heathman v. Colvin*, No. 2:13-CV-61-TIA, 2014 WL 4450462, at *15–16 (E.D. Mo. Sept. 10, 2014) (where the ALJ "wholly failed" to address a doctor's supplemental assessment, which may have affected the outcome of the decision). Here, it is unlikely that the inclusion of more specific discussion regarding the impairments would not have changed the outcome of the decision. These particular sub-findings, regarding "moderate to marked" limitations in social functioning and ability to adapt to the workplace, are not wholly inconsistent with the ALJ's opinion. And accordingly, this case is more akin to *Black v. Apfel*, 143 F.3d 383, 385–86 (8th Cir. 1998) (where discussion of a doctor's opinion was sufficient to show that the ALJ considered it and reasoning that "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.").

Plaintiff also argues that a GAF of 50 indicates serious limitation and, thus, the ALJ's finding that plaintiff had only "moderate" limitation in functioning

contravenes Dr. Spencer's opinion. Plaintiff's argument is somewhat misleading; Dr. Spencer assigned *a* GAF score in the *range* of 50 to 55. [Doc. #16 at 14; Doc. #23 at 3]; (Tr. 840). Moreover, as the ALJ explained, "because of the transient nature of GAF scores, they do not necessarily provide an accurate depiction of the claimant's typical ability to function" and accordingly the "Commission of the Social Security Administration has declined to endorse the scale for use in the disability determination process." (Tr. 24). Although the ALJ considered the GAF scores, he gave them "little weight." (Tr. 25).

In sum, the ALJ's overall conclusion draws from Dr. Spencer's opinion and relies on substantial evidence or "enough so that a reasonable mind might find it adequate to support the conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (*quoting Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). There is substantial evidence on the record for the ALJ's conclusion: Dr. Spencer's 2010 assessment (that plaintiff has a mental illness that "does not appear to interfere with her current ability to engage in employment suitable for her age, training, experience, and/or education"), plaintiff's hearing testimony, two opinions by Dr. Curry in April and May 2012 that found a GAF of 59 and generally cooperative and functional behavior, and Dr. Kodela's opinion from October 2013, which only found a marked limitation in one out of twenty different assessment categories – the ability to maintain attention and concentration for extended periods. Also, the ALJ questioned the vocational expert, John McGowan, about the potential effect of a marked limitation in the ability to interact socially. (Tr. 47). The expert told him that the assembly line jobs at issue involved "no direct interaction with co-employees." (Tr. 48). The ALJ also inquired about the effect of a marked limitation

in the ability to adapt to change in the workplace; the expert did not provide a clear response but noted that "these routine jobs are pretty simple." (Tr. 48). At most, therefore, this case is one where there is an "arguable deficiency in opinion-writing technique" that is not outcome determinative. *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) (quotation and citation omitted); *see also Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1992).

### Dr. Kodela's Opinion

Plaintiff next argues that the ALJ failed to "properly consider" Dr. Kodela's October 2013 opinion. [Doc. #16 at 16]. Specifically, she claims that the ALJ did not explain or factor in the limitations Dr. Kodela diagnosed, even though the ALJ claimed to have afforded Dr. Kodela's opinion "heavier weight." *Id.*[30] Plaintiff argues that the ALJ's conclusions deviated from those of Dr. Kodela's October 2013 assessment.

Dr. Kodela's opinion evaluated twenty categories within four areas of evaluation: (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adapt. In nineteen of these function areas, Dr. Kodela determined that plaintiff was "not significantly limited," or "moderately limited" – which appears to be consistent with the ALJ's ultimate conclusion. Dr. Kodela found that plaintiff had one marked limitation – her ability to maintain attention and concentration for extended periods. But, Dr. Kodela did not find any "'extreme' deficits" in generally maintaining concentration, persistence, or

---

[30] Generally, ALJs give more weight to opinions from treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations…" 20 C.F.R. §416.927(c)(2); *see also Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998).

pace. *See, e.g., Denney v. Colvin*, No. 4:14-CV-879-MDH, 2016 WL 901695, at *2 (W.D. Mo. Mar. 9, 2016). The ALJ explicitly acknowledged this marked limitation in his opinion, and stated that taken with the totality of the diagnosis plaintiff had "no more than moderate limitations in her ability to perform work related activities." (Tr. 23). Moreover, the ALJ addressed this limitation on concentration by limiting plaintiff to "simple" work at levels one and two – or "routine and repetitive tasks, with no strict production quotas, and the emphasis being on a per shift rather than a per hour basis." (Tr. 25). This case is therefore distinguishable from *Reynolds v. Astrue*, which plaintiff argues supports her assertions. There, a treating physician found that plaintiff "was disabled and unable to work," and while the ALJ was not bound to accept that conclusion, there was "no indication in the record that the ALJ even considered these opinions because he did not mention them in his opinion." *Reynolds*, No. 1:06-CV-64-CDP-DDN, 2007 WL 5100461, at *3 (E.D. Mo. Sept. 29, 2016). Here, Dr. Kodela's opinions regarding attention and concentration were not "omitted." *See Friziellie v. Astrue*, No. 4:11-CV-1782-LMB, 2013 WL 655157, at *17 (E.D. Mo. Feb. 22, 2013).

Plaintiff also argues that "the ALJ accounted only for the complexity of the task in the RFC" but that "a limitation in the complexity of the task does not account for a limitation the claimant may have in attending or concentrating to complete that task." [Doc. #16 at 18]. She notes that even an unskilled job requires the ability to concentrate for two-hour segments. [Doc. #16 at 18]. Plaintiff cites to *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996), *Leeper v. Colvin*, No. 4:13-CV-367-ACL, 2014 WL 4713280, at *10 (E.D. Mo. Sept. 22, 2014), *McAllister v. Astrue*, No. 1:05-CV-59-AGF, 2008 WL 4371494, at *18 (E.D.

Mo. Sept. 19, 2008), and *Rapp v. Colvin*, No. 12-CV-2743-PJS-TNL, 2014 WL 1017958, at *14 (D. Minn. Mar. 17, 2013), to support her argument. [Doc. #16 at 19]. But, in each of these cases, the courts did not remand on the grounds that plaintiff asserts – rather they found that a hypothetical question to an expert failed to take account of the full record of the claimant's deficiencies of concentration, persistence, or pace; these grounds are distinguishable from plaintiff's challenges. *Newton*, 92 F.3d at 695; *Leeper*, 2014 WL 4713280, at *10; *Rapp v. Colvin*, 2014 WL 1017958, at *14; *McAllister v. Astrue*, 2008 WL 4371494, at *18. Accordingly, these cases do not support the proposed contentions plaintiff puts forth.

In formulating his RFC, an ALJ is not required to provide an in-depth analysis or even to discuss every piece of evidence. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). "'Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). This is because it is the ALJ's "'function to resolve conflicts among the opinions of various treating and examining physicians.'" *Id.* (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The ALJ "'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.'" *Masterson v. Barnhart*, 363 F.3d 731, 737–38 (8th Cir. 2004) (quoting *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000)). And notably, here, plaintiff acknowledged in her application that she could pay attention to a task for several hours at a time or follow instructions. (Tr. 231–38). The ALJ also considered the plaintiff's testimony, daily activities, and the totality of the record in

determining that plaintiff had a moderate restriction in concentration. This conclusion is supported by substantial evidence and the Court will not remand on these grounds.

## VI.  <u>Conclusion</u>

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed.**

A judgment in accordance with this Memorandum and Order will be entered separately.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 24th day of March, 2017.